## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDERSON COULTER, | ) | |
| | ) | No. 15 CV 1974 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | November 3, 2016 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Anderson Coulter's son Anderson W. Coulter filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 423(d), 1382, claiming that he was disabled by diabetes, swelling of his left foot, obesity, and hypertension.[1] (Administrative Record ("A.R.") 101.) Anderson filed multiple applications for DIB and SSI contending that he had been disabled since 2008. After the Commissioner of the Social Security Administration denied Anderson's most recent applications, Coulter (because his son had passed away by then) filed this suit seeking judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Coulter's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed:

---

[1] For clarity, the court will refer to the senior Anderson Coulter as "Coulter" throughout this opinion, and to his son, the original claimant, as "Anderson." Coulter was substituted as the party claimant following Anderson's death.

## Procedural History

On January 13, 2012, Anderson filed the most recent of his applications for DIB and SSI, alleging that he had been disabled since November 13, 2008. (A.R. 11.) After his claims were denied initially and upon reconsideration, Anderson timely requested and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id.) Anderson died on January 2, 2013, while his request was pending. Coulter then replaced Anderson as the claimant.

On August 14, 2013, the ALJ held a hearing during which Coulter and a vocational expert ("VE") provided testimony. (Id.) The ALJ found that Anderson's applications were partially subject to the doctrine of *res judicata* as they pertain to the period covering November 13, 2008, to January 11, 2011, because Anderson was found not disabled during that period in connection with an earlier application.[2] (Id. at 16.) Accordingly, the ALJ fixed January 11, 2011, as the starting point for the period under consideration in this case and concluded that Anderson was not disabled during the relevant period. (Id.) After the Appeals Council notified

---

[2] Regarding the scope of this court's review, Coulter alleges that Anderson was disabled beginning November 13, 2008, (R. 16, Pl.'s Mem. at 1), but does not specifically challenge the ALJ's finding that "the period prior to January 11, 2011, is considered res judicata," (A.R. 16). The doctrine of *res judicata* bars attempts to relitigate a claim, but Anderson's claim that he was disabled in 2008 is not the same as a claim that he became disabled in 2011. *See Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998). When a claim involves a progressively disabling illness it is appropriate to admit "evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits." *Id.* at 810-11. The evidence should be reviewed again if it would "fill gaps in the evidence developed for the second proceeding." *Id.* at 811. Accordingly, an ALJ may consider evidence from the earlier proceedings without hesitation and, by expressly noting the application of *res judicata*, without concern that such a review will re-open the earlier claim.

Coulter that his request for review of the ALJ's decision was denied, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Coulter filed this action seeking judicial review of the denial, (R. 1); *see* 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to this court's jurisdiction, (R. 8); *see* 28 U.S.C. § 636(c).

## Background

The ALJ considered both documentary and testimonial evidence in rendering his decision on September 13, 2013.

## A. Medical Records

Between 2009 and 2012, Anderson received treatment at Komed Holman Health Center ("Komed") from several physicians including Dr. Timothy Long, Dr. Murad Abdel-Qader, and Dr. Joseph Gatlin. (A.R. 236-355, 369-89, 408-28.) The medical staff regularly checked Anderson's cardiovascular and respiratory systems and treated him for diabetes, but only a small number of records reflect individualized notes from Anderson's physicians. One such note shows Anderson's doctors discussed with him "at length" the importance of not running out of medicine. (Id. at 284.) A note on the same topic expressed concern that Anderson's inability to pay for diabetes medication limited his control over his diabetes. (Id. at 305, 310.) It is also apparent that Anderson's doctors repeatedly urged him to engage in an exercise program and conform to a healthy diet. Anderson was about five and a half feet tall, and weighed more than 350 pounds. On a handful of occasions Anderson reported pain or headaches, but most often he denied pain. In

2010, when asked, Anderson regularly denied chest pain, palpitations, feeling faint, trouble breathing, shortness of breath, peripheral edema, and elevated blood pressure.  (Id. at 244, 255, 289, 340, 352.)  However, he complained a few times about palpitations and feeling faint.  (Id. at 289, 321, 384.)  In 2011 and 2012, doctors regularly performed physical examinations to evaluate Anderson's peripheral circulation and found no clubbing, cyanosis, edema, or varicosities.  (See, e.g., id. at 315, 321, 331, 376, 385, 415, 426.)

From November 2009 to February 2011, Anderson attended several podiatry appointments with Dr. Abdel-Qader, who treated him for tinea pedis and diabetic issues affecting his feet.  (Id. at 241-42, 246-47, 250-52.)  Dr. Abdel-Qader's examination notes generally found Anderson's feet to be within the normal temperature gradient, with normal to cool skin temperature, and with normal to diminished hair growth.  (See, e.g., id. at 241, 246-47, 250, 262.)  Notably, at his last visit with Dr. Abdel-Qader in February 2011, Dr. Abdel-Qader observed that Anderson's feet were within the normal temperature gradient and were negative for edema, although his left foot had cool skin temperature and diminished hair growth.  (Id. at 326-27.)  By contrast, in April 2012 Anderson made his only office visit with podiatrist Dr. Joseph Gatlin who observed edema in both of Anderson's feet.  (Id. at 420-21.)

On February 15, 2012, Anderson's treating physician, Dr. Long, completed a physical medical source statement.  (Id. at 357-60.)  Dr. Long reported that he had maintained contact with Anderson on a monthly to bi-monthly basis for years and

had diagnosed Anderson with diabetes, hypertension, obesity, and foot pain. (Id. at 357.) Overall, Dr. Long gave Anderson a fair prognosis. (Id.) Dr. Long noted that Anderson experienced dizziness in the mornings, chronic foot pain, and anxiety. (Id. at 357-58.) He opined that Anderson could walk one or two blocks, could sit for 45 minutes and stand for 10 minutes at one time, could sit for a total of less than 2 hours per day, and could stand/walk for a total of less than 2 hours per day. (Id. at 358.) Dr. Long further opined that Anderson would need unscheduled breaks every 30 minutes, should keep his legs elevated for 50 percent of an 8-hour workday, and could rarely carry less than 10 pounds. (Id.) According to Dr. Long, his opinions of Anderson's symptoms and functional limitations were consistent with signs, clinical findings, and test results. (Id. at 360.)

On February 28, 2012, Dr. Calixto Aquino, a Bureau of Disability Determination Services ("DDS") medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment. (Id. at 361-68.) He opined that Anderson could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk 6 hours a day, sit for 6 hours a day, and perform unlimited pushing and pulling. (Id. at 362.) Dr. Aquino concluded that Anderson had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 363-67.) Dr. Aquino also concluded that Anderson's alleged disability was not supported by medical evidence. (Id. at 368.) According to Dr. Aquino, Anderson maintained very limited activities of daily living, but he was "capable [of] a wide range of medium activity." (Id.) On

July 3, 2012, Dr. Charles Kenney affirmed Dr. Aquino's RFC assessment. (Id. at 404-07.)

On June 30, 2012, DDS consultant Dr. David Voss prepared a Psychiatric Review Technique form. (Id. at 390-403.) Dr. Voss concluded that Anderson had a medically determinable impairment that did not precisely satisfy the diagnostic criteria for an anxiety-related disorder. (Id. at 395.) Dr. Voss also concluded that Anderson had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 400.) In forming these opinions, Dr. Voss reviewed medical evidence from Anderson's treating physicians and progress notes from Komed, specifically identifying Dr. Gatlin's and Dr. Long's records. (Id. at 402.) After reviewing Dr. Long's medical source statement, Dr. Voss observed that: (1) Dr. Long's medical records did not document any anxiety or depression; and (2) Dr. Long's progress notes from the same time period were inconsistent with the mental portion of his medical source statement. (Id.)

## B. Hearing Testimony

At the hearing before the ALJ on August 14, 2013, Coulter testified about his son Anderson. Anderson lived with his parents and one brother. (A.R. 31.) In 2008, Anderson was terminated from his most recent job as a security guard for calling in sick too often. (Id. at 42.) Coulter testified that Anderson could not work because of health problems allegedly caused by diabetes, high blood pressure, and

headaches.  (Id. at 31-33.)  Coulter summarized the events from the January 2013 morning when Anderson passed away after going into cardiac arrest, and explained that no autopsy was performed.  (Id. at 33-37.)  According to Coulter, Anderson was unable to use public transportation, could not use stairs, had difficulty walking, and had to wear special leggings and elevate his legs.  (Id. at 39-41, 44.)  Anderson's physical ability was so limited that Coulter "did everything for [his] son," including taking him to the clinic.  (Id. at 38-39.)

## C.    Vocational Expert Testimony

The VE testified at the hearing that Anderson's past employment as a security guard was a semi-skilled position.  (A.R. 49.)  The ALJ asked the VE what work would be feasible for an individual who can lift and carry no more than 10 pounds occasionally and less than 10 pounds frequently; can stand/walk about 2 hours and sit for about 6 hours in an 8-hour workday with normal rest periods; can alternate between sitting and standing although not necessarily at will; is unable to operate foot controls, work at heights, climb ladders, or frequently negotiate stairs; can only occasionally crouch, kneel, or crawl; and is limited to jobs without complex or detailed tasks.  (Id.)  The VE responded that such a person could work as a hand sorter, assembler, or packager.  (Id. at 50.)

## D.    The ALJ's Decision

The ALJ evaluated Anderson's claims under the required five-step analysis.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  As an initial matter, the ALJ determined that Anderson met the insured status requirements of the Act through December

31, 2013. (A.R. 13.) At step one, the ALJ concluded that Anderson had not engaged

in substantial gainful activity since November 13, 2008. (Id.) At step two, the ALJ

concluded that Anderson suffered from the following severe impairments: obesity,

hypertension, and diabetes. (Id.) At step three, the ALJ determined that Anderson

did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Id. at 14.) The ALJ specifically considered the criteria under Listings 4.00(H) and

9.00(5) to evaluate Anderson's cardiac issues and diabetes. (Id.) He also evaluated

whether Anderson's obesity compounded other health issues enough to meet a listed

impairment. *See* SSR 02-1p, 2002 WL 34686281. Before turning to step four, the

ALJ considered Anderson's RFC to perform full-time work in spite of his

limitations. The ALJ determined that:

> [Anderson] had the [RFC] to lift and carry 10 pounds occasionally and
> less than 10 pounds frequently, and could be on his feet
> standing/walking about 2 hours in an 8 hour workday with normal rest
> periods and sit about 6 hours, with normal rest periods. He would
> need to [be] able to alternate between sitting and standing, although
> not necessarily at will. He should avoid operation of foot controls. He
> would [be] unable to work at heights, climb ladders, or frequently
> negotiate stairs. He could only occasionally crouch, kneel, or crawl.
> He should avoid operation of moving or dangerous machinery. He
> would be limited to jobs that do not involve complex or detailed tasks.

(A.R. 15.) At step four, the ALJ determined that Anderson could not perform his

past work, but at step five, the ALJ concluded that Anderson was able to perform

jobs existing in significant numbers in the national economy. (Id. at 19.)

Accordingly, the ALJ concluded that Anderson was not disabled. (Id. at 21.)

**Analysis**

Coulter argues that the ALJ's RFC determination was faulty, that the ALJ gave insufficient weight to the opinions of Anderson's treating physician, and that the ALJ made an improper credibility assessment. (R. 16, Pl.'s Mem. at 1.) This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted). Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In order to adequately support the decision, the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation and citation omitted).

**A.     RFC Determination**

Coulter presents several challenges to the ALJ's RFC determination. He argues that the ALJ omitted several limitations without explanation, including an appropriate sit/stand option, Anderson's alleged heart condition, the need to elevate his legs, and headaches. (R. 16, Pl.'s Mem. at 13-18.) First, Coulter correctly points out that the ALJ erred in prescribing the sit/stand limitation without the required

9

specificity, but this error is harmless. SSR 96-9p requires an ALJ to include language in the RFC describing the specific frequency with which a claimant needs to alternate between sitting and standing. *See Arnett v. Astrue*, 676 F.3d 586, 593-94 (7th Cir. 2012) (citing SSR 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996)). If an RFC specifies that a claimant can alternate between sitting and standing at the "applicant's option," no more specificity is needed. *See id.* (rejecting a sit/stand option applicable "throughout the workday" because it did not specify frequency); *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (explaining that a sit/stand option "as needed" encompasses all ratios of sitting to standing). Here, the RFC as defined by the ALJ does not detail for how long Anderson could remain in one position before needing to switch. Instead, it merely states that Anderson "would need to be able to alternate between sitting and standing, although not necessarily at will." (A.R. 20.) Even though the ALJ failed to specify the frequency with which Anderson would need to switch positions, the VE explained that the jobs identified for Anderson—sorter, assembler, and packer—could be performed while sitting or standing. (Id. at 52.) The VE clarified that Anderson could sit or stand at his option, so long as he completed his assignments. Coulter's attorney asked the following questions and the VE gave the following answers:

Q. Are these [] production rate [jobs]?

A: They're not – the production rate, how many pieces you have to put together –

Q: Yes.

A: – is more in your semi-skilled types of occupations. You do need to keep up persistence and pace. You're not asking for a specific number. So that's where the off task comes into play in these types of jobs.

Q: And would these jobs ordinarily be performed at the seated position or the standing position?

A: They could actually be performed at either sitting or standing as long as they get their work completed.

Q: So if the individual was unable to stand, say, for two out of eight hours, would that reduce the number of jobs available?

A: Well, are they able to sit?

Q: Yes.

A: I mean if you'[v]e indicated that they could sit all day long, eight hours, it ain't going to change.

Q: So they could do all these jobs?

A: That's correct. I mean, as long as – these jobs require the utilization of your bilateral upper extremities in order to complete the work-related tasks, not necessarily the ability to sit or stand throughout the course of the workday.

(Id.) The VE's testimony distinguishes the jobs identified for Anderson from others in which a sit/stand option has been described as "not necessarily at will," such as chauffer or courier driver. *See, e.g.*, *Hendrix v. Colvin*, No. CIV-13-522-M, 2014 WL 4929427, at *5 (W.D. Okla. Sept. 30, 2014). In contrast with the jobs identified for Anderson, a chauffeur must sit to drive for extended periods and may need to stand at very specific times to open doors or attend to the vehicle—clearly illustrating a sit/stand option not necessarily at will. Here, the VE's testimony assures the court that it can predict with great confidence that the result would not change on remand because the record overwhelmingly supports that Anderson would be

allowed to perform the jobs identified while sitting or standing at Anderson's option. Because modifying the RFC to specify an at-will sit/stand option—the most restrictive sit/stand limitation—would not eliminate the jobs identified by the VE, the ALJ's error is harmless and remand is unnecessary. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Second, Coulter contends that the RFC fails to capture limits associated with his alleged heart conditions. However, Coulter has not pointed to any record evidence supporting his attorney's diagnoses that Anderson must have suffered from peripheral artery disease and left ventricular hypertrophy. Coulter concedes that Anderson's diagnosed heart murmur might have been harmless. (R. 16, Pl.'s Mem. at 16.) But he believes that "[i]t is entirely reasonable to infer that [Anderson] had a heart condition prior to having experienced his fatal heart attack." (Id. at 15-16.) Coulter supports this self-diagnosed peripheral artery disease theory by listing a handful of symptoms from Anderson's medical records that are, according to him, commonly observed in patients with the disease: feet cool to the touch, reduced hair growth, and reduced sensation. (Id.) Coulter also cites a March 9, 2011 physician note to argue that Anderson experienced "chest pain and palpitations, with shortness of breath and difficulty breathing." (Id. at 3, 8, 16.) But Coulter overlooks the fact that the same record also notes that Anderson denied chest pain, shortness of breath, difficulty breathing, peripheral edema, elevated blood pressure, and decreased heart rate. (A.R. 321.) As for left ventricular hypertrophy, that appears in the record only as having been "possible" after an

ECG, (id. at 324), but Coulter's attorney cites to the Mayo Clinic's website on disease symptoms as if it were settled that Anderson suffered from this condition, (R. 16, Pl.'s Mem. at 15-16).  Like the ALJs, a party's counsel may not play doctor. *Parker v. Colvin*, No. 16-1030, ___Fed. Appx.___, 2016 WL 6128044, *3 (7th Cir. Oct. 20, 2016).  Given the lack of record support, Coulter's argument that the ALJ failed to "discuss the effect of other objective evidence demonstrating peripheral artery disease" is a tenuous one.  (R. 16, Pl.'s Mem. at 17.)  The ALJ acknowledged that Anderson ultimately died of cardiac arrest but had no history of congestive heart failure or coronary disease.  (A.R. 16.)  No autopsy was performed to provide insight into the condition of Anderson's heart during the relevant period.  (Id.; see also id. at 30, 35-36, 116.)  The ALJ also rejected Listing 4.00(H), which covers cardiovascular impairments, (id. at 14), a finding that Coulter does not contest. Overall, the record identifies some of the symptoms central to Coulter's RFC arguments, including chest issues like palpitations, headaches, swollen legs, and mobility issues.[3]  But Coulter concedes that the ALJ who presided over Anderson's 2008 claim had already evaluated headaches, leg swelling, trouble walking, and "the same complaints that he died of." (A.R. 46; see also id. at 116 (identifying cause of death as diabetes, hypertension, and obesity).)  The ALJ was not required to conduct online research or deduce that Anderson suffered from an undiagnosed heart condition given the absence of evidence in the record.  And, as the government

---

[3]  Even if the March 9, 2011 record is viewed in Coulter's favor, there is just one other report of palpitations.  (A.R. 289, 321.)  He denied similar symptoms several times.  (Id. at 244, 255, 260, 270, 277, 284, 331, 340, 352.)

correctly argues, what matters for purposes of this court's review are the limitations Anderson suffered as a result of a medical condition, not whether he suffered from a particular medical condition. (See R. 24, Govt.'s Mem. at 7.) Because the court is satisfied that the ALJ properly considered and evaluated Anderson's cardiac symptoms, that aspect of the RFC is supported by substantial evidence.

Third, Coulter argues that the ALJ improperly discounted Anderson's need to elevate his legs. (R. 16, Pl.'s Mem. at 14.) Coulter's argument regarding foot pain and swelling relies to some degree on the alleged heart condition discussed above. (Id.) According to Coulter, the ALJ failed to explain why the evidence did not support a finding that Anderson needed to keep his legs elevated to reduce swelling. (Id. at 15.) But the record shows that Anderson denied edema, or his examining doctor repeatedly found no edema upon physical examination. (See A.R. 244, 255, 260, 270, 274, 281, 284, 290, 296, 303, 315, 321, 326-27, 331, 340, 352, 377, 385, 415, 426.) The ALJ acknowledged Coulter's testimony about Anderson's need to keep his legs elevated, noted a single medical report of edema, and considered the opinion of Dr. Long that Anderson needed to keep his legs elevated. (Id. at 16-18.) But because the "treatment records generally reflect that the claimant did not have edema or pain," the ALJ did not include the need to elevate his legs as a limitation in the RFC determination. (Id. at 18.) An ALJ may, as was done here, discount a portion of a medical opinion by explaining how it is inconsistent with the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (explaining that an ALJ is not substituting the physician's judgment when she relies on other medical evidence or

authority in the record).  Because the ALJ cited evidence contradicting Dr. Long's opinions, the ALJ's explanation of the record is sufficient on this point.

Fourth, Coulter contends that the ALJ gave Anderson's complaints of headaches insufficient consideration when assessing his RFC.  But the ALJ acknowledged Coulter's testimony and Dr. Long's notes on Anderson's headaches. (A.R. 16; see also id. at 41 (Coulter testifying that Anderson reported headaches to the ALJ at his previous hearing).)  The ALJ acknowledged that Anderson "occasionally complained of headaches . . . but otherwise Dr. Long's treatment records show few complaints."  (Id. at 16.)  For example, in January 2012 Anderson reported a headache that improved with Tylenol.  (Id. at 17, 289.)  Another time, Anderson complained of lightheadedness, dizziness, and a headache to Dr. Long's nurse, but left the office without seeing the doctor.  (Id. at 18, 408-09; see also id. at 296, 315, 321, 376, 384, 425 (identifying headaches).)  Notably, the ALJ did not list headaches as a severe impairment at step two of his analysis, and Coulter does not contest that decision.  Beyond some testimony previously addressed at the earlier hearing, Coulter points to no discussion of migraines, prescription or other headache treatment, or a headache-related diagnosis by Anderson's physicians. The ALJ's analysis in combination with the limited evidence of headaches does not present a remandable issue.

Fifth, Coulter argues that the ALJ, having rejected all of the medical opinions regarding Anderson's capacity to do work, filled the void with his own conclusions and took the middle ground when he determined that Anderson could

lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk 2 hours, and sit up to 6 hours in an 8-hour day with the ability to alternate between sitting and standing. (R. 16, Pl.'s Mem. at 12-13.) Coulter contends that those conclusions are at odds with both the treating physician's opinion and the assessment provided by the consulting physicians and that the ALJ did not identify any medical evidence to support this conclusion. (Id. at 11-12 (citing SSR 96-8p, 1996 WL 334184; *Scott v. Astrue*, 674 F.3d 734, 740 (7th Cir. 2011); *Suide v. Astrue*, 371 Fed. Appx. 684, 689-90 (7th Cir. 2010)).) The government argues that Coulter's reliance on *Suide* is misplaced because "[t]he error in *Suide* was not that the ALJ did not rely on a doctor's opinion to assess RFC; rather, the error was that the ALJ failed to discuss the significant medical evidence in the record." (R. 24, Govt.'s Mem. at 6 (quoting *Allen v. Colvin*, No. 13 CV 951, 2015 WL 4574774, at *11 (S.D. Ill. July 29, 2015)).)

When developing an RFC, an ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to [SSR 96-8p]." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *see* 20 C.F.R. § 404.1545(a)(1). SSR 96-8p provides guidance on the development of RFCs and instructs ALJs to consider "all of the relevant evidence in the case record," including opinions from treating sources or other acceptable medical sources about what the claimant can do despite his impairments. SSR 96-8p, 1996 WL 374184, at *1-2 (July 2, 1996); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (explaining that RFC assessments are

based on medical evidence, physical and mental impairments whether or not severe, and testimony from the claimant and family).

Here, the ALJ did not fully adopt any physician's opinion in developing the RFC. But that is permissible because developing the RFC is a fact-finding task assigned to the ALJ. *See* SSR 96-8p, 1996 WL 374184, at *2 n.4. And when the RFC form completed by a treating physician is not supported by the physician's own treatment records, the ALJ is not required to depend entirely on that opinion. *See Stepp*, 795 F.3d at 719. However, the ALJ must assure the court that he considered important evidence by accurately bridging the evidence and his conclusions. *See Betts v. Colvin*, No. 13 CV 6540, 2016 WL 1569414, at *1-2 (N.D. Ill. April 19, 2016) (explaining that a medical history summary is inadequate if the ALJ fails to articulate how the medical history was used to draw conclusions). An ALJ commits reversible error when he fails to point to evidence to support his RFC determination. *Suide*, 371 Fed. Appx. at 690.

Coulter takes issue with the fact that the RFC was more restrictive than the opinions of the state agency consultants who opined that Anderson was capable of medium work, able to lift or carry 50 pounds occasionally and 25 pounds frequently, and had the ability to sit, stand, or walk 6 hours each in a typical workday. (R. 16, Pl.'s Mem. at 11-12.) He contends that the ALJ failed to explain some of the RFC's specific limitations, such as that Anderson could lift and carry 10 pounds occasionally and less than 10 pounds frequently, that he could stand and/or walk 2 hours, and that he could sit up to 6 hours per workday if allowed to alternate

between sitting and standing for an unspecified amount of time. (Id. at 12-13; see also A.R. 361-68, 404-07 (DDS consultant opinions).)[4]

Even though the final RFC determination limiting Anderson to sedentary work was more restrictive than the medium work suggested by the state agency consultants, an ALJ may accept certain portions of an opinion while rejecting others. *See Ulloa v. Astrue*, 611 F. Supp. 2d 796, 809-10 (N.D. Ill. 2009). And if a claimant can do medium work, by rule they can also do sedentary work. *See* 20 C.F.R. § 404.1567(c). The restrictions outlined by the ALJ are consistent with SSR 96-9p's description of sedentary work. *See* 1996 WL 375185, at *3, 6-7 (limiting claimants to lifting 10 pounds at a time, and generally no more than 2 hours standing and walking per day). After reviewing the state agency consultants' opinions, which received some weight, the ALJ explained that he reduced Anderson to sedentary work because the state agency consultants "did not fully consider the impact of the claimant's combination of impairments, especially his obesity with a BMI of approximately 56." (A.R. 18.) Moreover, the ALJ identified Coulter's testimony and Dr. Long's reports regarding Anderson's obesity, hypertension, and diabetes. (Id. at 16.) The ALJ also summarized medical evidence supporting his RFC assessment. (Id. at 16-18). An ALJ is required to include limitations in the RFC only if he finds them credible and supported by the medical evidence. *See*

---

[4] The ALJ's decision to give Dr. Long's opinion less than controlling weight, (see Section B, infra), opens the door to relying on the consulting physicians' opinions and RFC assessments, including their assessments of Anderson's ability to sit and stand for a combined eight hours. *See Schoenfeld v. Colvin*, No. 15 CV 267, 2016 WL 878263, *3-6 (N.D. Ill. March 8, 2016).

*Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011). Because the decision to restrict Anderson to sedentary work is supported by substantial evidence, and the court can follow the ALJ's reasoning, that aspect of the ALJ's decision must also be affirmed.

## B.    Treating Physician's Opinion

Coulter's next set of arguments are aimed at the ALJ's handling of the opinions of Anderson's treating physician, Dr. Long. Coulter argues that where Anderson's medical records were "silent" on certain issues—e.g., chronic pain, swelling of the feet, the need for a cane, and anxiety—the ALJ drew improper inferences against Anderson when weighing Dr. Long's opinions with respect to those conditions. (R. 16, Pl.'s Mem. at 7-10.) Coulter also contends that the ALJ failed to point to any inconsistencies between Dr. Long's treatment notes and his opinions, making the ALJ's decision to give his opinion less than controlling weight an error. (Id. at 10.) Last, Coulter argues that even if Dr. Long's opinions did not deserve controlling weight, the ALJ failed to properly follow the treating physician rule requirements set out in 20 C.F.R. § 404.1527. (Id. at 10-11.)

Regarding the issue of "silence" in the medical records, Coulter argues that where Dr. Long made "no mention" of certain conditions, the ALJ may not conclude that "no mention" means the record contradicts Dr. Long's opinions about pain allegations. (Id. at 7-8.) And if the record was unclear, Coulter asserts that the ALJ should have contacted Dr. Long for more information. (Id. at 10.) The government counters that the ALJ did not rely simply on the absence of evidence,

but on Dr. Long's records, in finding that Anderson affirmatively and repeatedly denied pain. (R. 24, Govt.'s Mem. at 4 (citing A.R. 18).)

Here, the medical records support the ALJ's findings discounting Dr. Long's opinion that pain would interfere with Anderson's ability to work. Dr. Long's physical medical source statement indicated that Anderson had battled severe, chronic pain on a daily basis for years. (A.R. 357.) But Anderson consistently denied pain. For example, in January 2012, the same month he filed this application for benefits, Anderson was asked if pain was affecting his activity level and whether there was any pain issue that his doctor should address. (Id. at 288-89.) He responded to both questions in the negative. (Id.) When Anderson was asked those same questions at several medical visits, Anderson consistently denied pain in 2010 (three times), 2011 (six times), and even after filing this application in 2012 (four times). (Id. at 295, 302, 308, 314, 320, 330, 339, 345, 351, 371, 375, 380, 383, 414, 420, 424.) Anderson also denied back, joint, and chest pain. (Id. at 321, 331, 340, 352.) True, on a few occasions Anderson reported some pain, but the vast majority of his medical records—including several created in 2012 after he filed the application that led to this lawsuit—support the ALJ's conclusion that he did not experience chronic pain. Coulter's contention that Anderson experienced chronic pain even though he reported that it was not affecting his activities is unpersuasive. (R. 29, Pl.'s Reply at 1.) The absence of chronic pain reports in combination with Anderson's repeated denial of pain provides a reasonable basis for the ALJ to have found Dr. Long's opinion on pain inconsistent with the record.

Similarly unpersuasive are Coulter's related arguments that the ALJ failed to adequately consider Dr. Long's opinions that Anderson suffered from edema and anxiety and needed a cane, and that the ALJ erred when he concluded Dr. Long's opinions were "markedly" inconsistent with his treatment records. (R. 16, Pl.'s Mem. at 7.) An ALJ must consider several factors when weighing a treating physician's medical opinion and should give greater weight to an opinion if it provides a detailed, longitudinal picture that is well-supported by acceptable clinical and laboratory diagnostic techniques over an extended period of time. 20 C.F.R. § 404.1527(c)(1)-(6). Collectively, the factors are designed to strike a balance between the benefit derived from a physician's ability to observe a claimant over an extended period of time and the danger that the same physician might find a disability out of loyalty to the patient. *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011). An ALJ is entitled to discount a treating physician's opinion if it is either unsupported by medically acceptable diagnostic techniques or is inconsistent with other substantial evidence. *Stepp*, 795 F.3d at 719; *see also Ketelboeter*, 550 F.3d at 625. When an ALJ identifies ways in which a treating physician's opinion or RFC assessment are not in line with the bulk of the medical evidence, the ALJ may give the treating physician's opinion less than controlling weight. *Turner v. Astrue*, 390 Fed. Appx. 581, 586 (7th Cir. 2010). When the treating physician's opinion is not controlling and it conflicts with other opinions, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may

bring expertise and knowledge of similar cases—subject [to] only the requirement that the ALJ's decision be supported by substantial evidence." *Schoenfeld v. Colvin*, No. 15 CV 267, 2016 WL 878263, *3 (N.D. Ill. March 8, 2016) (quoting *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992)).

This court finds that the ALJ accurately identified the inconsistencies between the medical records and Dr. Long's opinions and provided good reasons for giving them less than controlling weight. The ALJ concluded that "the limitations listed by Dr. Long in his opinion are out of proportion with the fairly mundane objective findings in his treatment records." (A.R. 18-19.) First, numerous records support the ALJ's conclusion that edema was not a significant issue because as discussed above, Anderson generally denied edema and his doctor observed no edema upon physical examination. (See id. at 244, 255, 260, 270, 274, 281, 284, 290, 296, 303, 315, 321, 326-27, 331, 340, 352, 377, 385, 415, 426.) Further, Coulter's argument relies on the unsupported inference that Dr. Long in fact reviewed Anderson's podiatry records just because they may have been available to all physicians at Komed. (R. 16, Pl.'s Mem. at 8.) But Dr. Long did not summarize the scope of medical records considered in rendering his opinion. (A.R. 356-60.) Second, Coulter's argument that Anderson experienced anxiety is unsupported because the medical records show that he did not require treatment for anxiety. (Id. at 17-18.) Third, contrary to Coulter's argument, the medical records do not suggest that Anderson required a cane. In fact, he reported that he did not use a cane. (Id. at 195, 222.) Moreover, there is no medical necessity for a cane when a claimant

does not identify and the court cannot find an opinion from a physician explaining the medical necessity. *See Tripp v. Astrue*, 489 Fed. Appx. 951, 955 (7th Cir. 2012) (checking a box for a hand-held assistive device does not establish medical necessity). Because the ALJ accurately explained that Dr. Long's opinions do not match the medical evidence or even Anderson's complaints of symptoms, the ALJ's decision to give Dr. Long's opinion less than controlling weight is supported by substantial evidence.

## C.    Credibility Assessment

Coulter next argues that the ALJ's findings lacked sufficient explanation as to which statements were credible and which were not, making judicial review impossible. (R. 16, Pl.'s Mem. at 18.) More specifically, Coulter contends that the ALJ relied too heavily on his finding that the objective evidence did not fully support Anderson's or Coulter's allegations. (Id. at 19.) This court's review of an ALJ's analysis of the credibility of a claimant's symptoms is particularly deferential because the credibility determination will only be overturned if it is "patently wrong," or "divorced from the facts contained in the record." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).

Here, the ALJ provided a brief credibility assessment, finding Coulter and Anderson "not fully credible." (A.R. 15-16.) In addition to concluding that the objective evidence did not support the severity of the alleged limitations, the ALJ noted that Anderson's "routine and conservative treatment" consisted primarily of follow-up visits. (Id.) The court recognizes that a claimant's testimony describing

his symptoms may not be discredited solely for lack of objective medical evidence, *see Thomas v. Colvin*, 745 F.3d 802, 806-07 (7th Cir. 2014), and that an ALJ's credibility analysis should include good reasons to justify his findings related to a claimant's daily activities, reports of pain and symptoms, aggravating factors, medication, treatment, and other limitations, *see Villano*, 556 F.3d at 562.[5] Here, in addition to considering the objective measurements and observations, the ALJ considered Anderson's complaints about headaches and foot pain and general denials of pain, depression, "symptoms of obesity, hypertension, and diabetes mellitus, including loss of appetite, chills, dizziness, fatigue, fever, feeling ill, sweats, night sweats, sleep disturbances, and weight loss." (A.R. 16.) The ALJ was unable to include any analysis of Anderson's testimony or details of his daily activity because he passed away before the hearing, but the ALJ did consider Anderson's reports of his symptoms as recorded in the medical records. The ALJ noted Coulter's testimony that he did everything for his son and acknowledged Coulter's statements regarding Anderson's limited daily activities, use of special leggings, swelling in his legs, and headaches. (Id.) But the ALJ also correctly noted that Anderson was not hospitalized even one time the year before his death. (Id.) The ALJ further considered Anderson's level of treatment, reports of pain and symptoms, and use of medication. (Id. at 16-18.) The court is able to connect the

---

[5] Since the ALJ's decision was issued, SSR 96-7p was superseded by SSR 16-3p. In SSR 16-3p, the Social Security Administration ("SSA") announced that the "credibility" of claimants will no longer be assessed. Instead, as the Seventh Circuit recently recognized, the SSA will "focus on determining the 'intensity and persistence of the [claimant's] symptoms.'" *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (citing SSR 16-3p, 2016 WL 1020935 (March 16, 2016)).

dots because the ALJ discussed the evidence available in the record and sufficiently covered the factors identified in the regulations to explain how he weighed the severity of Anderson's symptoms. *See* 20 C.F.R. § 404.1529(c); *Villano*, 556 F.3d at 562. Although the analysis could have been more robust, the court cannot say in this case that the ALJ's reasoning or conclusions were patently wrong. Accordingly, this court must uphold the ALJ's credibility finding. *See Spies v. Colvin*, 641 Fed. Appx. 628, 633 (7th Cir. 2016).

## Conclusion

For the foregoing reasons, Coulter's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**